In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2507

Willie Jacobs and Linda Siller,

Plaintiffs-Appellants,

v.

City of Chicago , a municipal corporation;
the estate of Sergeant Michael Garner;
Officers Quintero, Buckner, McLean, Keith,
and Garrido; and Metropolitan Enforcement
Group Officers Huff, Martin, Sowinski,
and McIntyre,

Defendants-Appellees.

Appeal from the United States District Court for
the
Northern District of Illinois, Eastern Division.
No. 98 C 0954--Charles R. Norgle, Sr., Senior
Judge.

Argued January 14, 2000--Decided June 1, 2000

Before Flaum, Easterbrook, and Ripple,
Circuit Judges.

Flaum, Circuit Judge.  Willie Jacobs and
Linda Siller brought claims under 42
U.S.C. sec. 1983 against the City of
Chicago and several individual Chicago
police officers (the "Defendant
Officers"), alleging violations of their
Fourth Amendment right to be free from
unreasonable searches and seizures and
excessive use of force. The district
court dismissed the complaint under
Federal Rule of Civil Procedure 12(b)(6),
finding that the defendants enjoyed qual
ified immunity for all of the claims
brought against them. For the reasons
stated herein, we reverse and remand.

I.  BACKGROUND/1

   Plaintiffs Willie Jacobs and Linda
Siller live in Apartment #2 at 15138
Lincoln Avenue in Harvey, Illinois. There
are three apartments in the building at

this address.  The wall next to the door of each apartment is marked by the word "Apt." followed by a number. Each apartment has its own separate outside entrance and its own doorbell. There are two gas meters located on the outside of the building providing service to the first and second floor apartments. The three apartments are each billed separately for electricity and telephone service. Apartment #2 is located on the second floor and has an outside entrance at the side of the building.

On February 18, 1997, defendant Officer Quintero of the Chicago Police Department obtained a search warrant for "Troy," a 30-year-old black male, and a single family residence at 15138 Lincoln Avenue in Harvey. The warrant was issued based on information, provided by a confidential informant, that a large amount of cocaine base was being sold out of the building.

Later that afternoon, the Defendant Officers went to the apartment building at 15138 Lincoln Avenue. They executed the warrant on the first floor apartment, which is entered through a door at the front of the building. The owner of the building Marie Golden lived in this apartment. She informed the officers that there were two other apartments in the building, that no one named Troy lived in the building, and that she did not know anyone named Troy.  Golden also told the officers that someone named Jacobs lived in the upstairs apartment and that Jacobs was ill, having recently returned from the hospital. The Defendant Officers searched Golden's apartment.

The Defendant Officers then went back outside the building and around to the side entrance of Apartment # 2. They broke down the door without knocking or announcing that they were police officers executing a search warrant. An officer approached plaintiff Jacobs, a sixty-year-old man, and pointed a gun at his head. The officers then asked Jacobs if he was Troy, the thirty-year-old man who was the subject of the search warrant. Jacobs responded that he was not Troy and that no one named Troy lived in the apartment. Jacobs provided the officer with identification and told the officer that he needed to sit down because he felt faint. The officer kept the gun at

Jacobs' head for over ten minutes while the other Defendant Officers began searching Jacobs' apartment. During the search, several items of furniture and many of the plaintiffs' personal belongings were damaged. One of the Defendant Officers claimed to have found a small amount of cocaine on a dresser in a bedroom used by Jacobs' grandchildren. The Defendant Officers then continued to search Jacobs' apartment for over three hours, detaining Jacobs in his home throughout the search. During this time, the Defendant Officers called in a canine unit to assist with the search, but the dog did not indicate the presence of any drugs in the apartment or on Jacobs' person.

Jacobs alleges that he suffered severe emotional injury as a result of the Defendant Officers' search of his apartment, their detention of him during the search, and their use of force by holding a gun to his head for several minutes. Shortly after this incident, Jacobs suffered a heart attack. Linda Siller was also an occupant of the apartment. She returned home after the search had been completed to find her property damaged. No one was arrested or prosecuted as a result of the search of the apartment building.

Jacobs and Siller filed suit under 42 U.S.C. sec. 1983 against the City of Chicago and the Defendant Officers, claiming that their Fourth Amendment rights were violated by the search of their apartment and the seizure of Jacobs as well as by the excessive use of force against Jacobs. The district court dismissed plaintiffs' complaint under Rule 12(b)(6), finding that the defendants enjoyed qualified immunity for all of the claims brought by the plaintiffs. Jacobs and Siller now appeal./2

II.  DISCUSSION

The plaintiffs appeal the district court's dismissal of their complaint under Rule 12(b)(6) on the ground that the defendants are entitled to qualified immunity for all of the claims brought against them. We review the district court's dismissal de novo. See Payton v. Rush-Presbyterian St. Luke's Medical Center, 184 F.3d 623, 625 (7th Cir.

1999). We accept all of the plaintiffs' allegations as true and draw all reasonable inferences in their favor. General Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1080 (7th Cir. 1997)./3

## A. Consideration of Matters Outside of Complaint

The plaintiffs first contend that the district court erred when it considered several photographs of the apartment building, submitted by the defendants and the plaintiffs, and a copy of a police report, submitted by the defendants, in ruling on the defendants' motion to dismiss.

Federal Rule of Civil Procedure 12(b) states:

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgement and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

By the plain language of this rule, when the defendants submitted photographs of the apartment building and a copy of a police report and the plaintiffs submitted their own photographs in response, the district court was obligated to either not consider the extraneous submissions in ruling on the motion or to convert the motion to one for summary judgment and provide the parties with an opportunity to submit supplementary materials. See Carter v. Stanton, 405 U.S. 669, 671 (1972). It is evident that the district court relied on the photographs as well as the report in ruling on the motion to dismiss and that it did not convert the motion to one for summary judgment. We hold that the district court's reliance on matters outside the complaint in ruling on the motion to dismiss was in error.

The error committed by the district court may constitute grounds for reversal. See id.; Travel All Over the World, Inc. v. Saudi Arabia, 73 F.3d 1423, 1430 (7th Cir. 1996). However,

rather than remand for the district court to reconsider its opinion without looking at matters outside of the compliant, our usual practice is to determine whether the error was harmless by conducting our own de novo analysis of the complaint under the Rule 12(b)(6) standard without considering the extraneous materials relied upon by the district court. See General Elec. Capital, 128 F.3d at 1084 ("[W]e may consider the error harmless and affirm if Rule 12(b)(6) dismissal would have been appropriate without examination of the extrinsic documentation."); Travel All Over, 73 F.3d at 1430. We will affirm the district court's dismissal only if we determine by conducting our own analysis of the complaint alone that the plaintiffs fail to state a claim upon which relief can be granted.

## B. Qualified Immunity

State officials who occupy positions with discretionary or policymaking authority and are acting in their official capacity may have qualified immunity for claims alleging that the state officials violated the constitutional rights of a plaintiff. Siegert v. Gilley, 500 U.S. 226, 231 (1991); Harlow v. Fitzgerald, 457 U.S. 800, 815-16 (1982). These officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818; see Wilson v. Layne, 119 S.Ct. 1692, 1696 (1999); Anderson v. Creighton, 483 U.S. 635, 638 (1987).

To evaluate a claim of qualified immunity, we engage in a two-step analysis. First, we determine whether the plaintiffs' claim states a violation of their constitutional rights. Then, we determine whether those rights were clearly established at the time the violation occurred. See Wilson, 119 S.Ct. at 1697; Khuans v. School Dist. 100, 123 F.3d 1010, 1013 (7th Cir. 1997). If the rights were clearly established, the official may be liable for monetary damages and the suit proceeds to the next stage. If the rights were not clearly established, then the official is immune from suit and the claim is dismissed. See

Richardson v. McKnight, 521 U.S. 399, 403 (1997).

It is the plaintiffs' burden to demonstrate that a constitutional right is clearly established. Kernats v. O'Sullivan, 35 F.3d 1171, 1176 (7th Cir. 1994). A clearly established right is one where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640; see Wilson, 119 S.Ct. at 1700. To determine whether a right is clearly established, we look first to controlling Supreme Court precedent and our own circuit decisions on the issue. In the absence of controlling precedent, we broaden our survey to include all relevant caselaw in order to determine "whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." Cleveland-Perdue v. Brutsche, 881 F.2d 427, 431 (7th Cir. 1989). In some rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the court with any analogous cases, as widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated. See Kernats, 35 F.3d at 1176.

In this case, plaintiffs allege that the defendant Chicago police officers violated their clearly established Fourth Amendment rights. Police officers conducting a search are state officers with discretionary authority who are acting in their official capacity and may be protected by qualified immunity in suits challenging the constitutionality of their actions. See Anderson, 483 U.S. at 641.

C. Search

1. Constitutionality of Search

a. Validity of Search Warrant

Plaintiffs first argue that the search of their apartment violated their Fourth Amendment rights because it was not conducted pursuant to a valid search warrant. They allege that the warrant was invalid because it did not particularly describe the place to be searched.

A warrant is valid under the Fourth Amendment only where it is based "upon probable cause, supported by Oath or affirmation, and particularly describ[es] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Where a warrant fails to describe with particularity the place to be searched, it is void. See Horton v. California, 496 U.S. 128, 139-40 (1990); United States v. Higgins, 428 F.2d 232, 234 (7th Cir. 1970) ("[P]robable cause and the particular description of the place to be searched are essential requirements of equal importance."); United States v. Hinton, 219 F.2d 324, 326 (7th Cir. 1955). We have consistently held that probable cause to search one apartment in a multi-unit building does not support a warrant authorizing a search of the entire building. Rather, "when a building is divided into more than one residential unit, a distinct probable cause determination must be made for each unit." United States v. Butler, 71 F.3d 243, 248 (7th Cir. 1995); see also Maryland v. Garrison, 480 U.S. 79, 85 (1987) (stating that if police officers knew or should have known that a building contains multiple "separate dwelling units," the officers are obligated to exclude from the warrant any units for which they do not have probable cause to conduct a search); Hinton, 219 F.2d at 325-26 ("For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more completely separate houses. Probable cause must be shown for searching each house or, in this case, each apartment."). A warrant authorizing the search of an entire multi-unit building is fatally defective "when the warrant authorizes the search of an entire structure and the officers do not know which unit contains the evidence of illegal conduct." United States v. Johnson, 26 F.3d 669, 694 (7th Cir. 1994); see also Higgins, 428 F.2d at 234-35. The only exceptions to this general rule are when "(1) the officer knows there are multiple units and believes there is probable cause to search each unit, or (2) the targets of the investigation have access to the entire structure." Johnson, 26 F.3d at 694; see also Hinton, 219 F.2d at 326.

The warrant in this case authorized the search of a single-family residence located at 15138 Lincoln Avenue in Harvey, Illinois. In fact, the building located at this address is a multi-unit building consisting of three separate residential apartments. Thus, on its face, the warrant does not describe the place to be searched with particularity. In addition, from the allegations pled in the complaint, there is no indication that a neutral magistrate found either that there was probable cause to suspect illegal activity was being conducted in the plaintiffs' apartment or that Troy, the target of the search warrant, had access to the entire apartment building. However, "[t]he validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty of discover and to disclose, to the issuing Magistrate." Garrison, 480 U.S. at 85. The plaintiffs do not allege that the officers seeking the warrant concealed information from the issuing magistrate that they were under a duty to disclose. Because we do not judge the validity of a warrant "[w]ith the benefit of hindsight", id., we conclude that although the warrant turned out to be overbroad because it did not describe with particularity the place to be searched and encompassed a separate dwelling unit, the plaintiffs' apartment, for which there was no probable cause to authorize a search, it was valid at the time it was issued based on the information the officers presented to the magistrate./4

b. Execution of Search Warrant

Plaintiffs next argue that even if the warrant was valid when it issued, the Defendant Officers violated their Fourth Amendment rights in the manner in which they executed that warrant.

In Maryland v. Garrison, the Supreme Court held that the search of Garrison's apartment was valid even though it was based on a warrant that was later discovered to be overbroad where the officers believed in good faith that the entire third floor of the building that was described in their search warrant was a single apartment and they discovered contraband in Garrison's apartment before becoming aware that there were in fact two apartments on the third floor. 480

U.S. at 80-81. However, the Court also stated that

[i]f the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to [the search target's] apartment. Moreover, as the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant.

Id. at 86-87. Similarly, in United States v. Higgins, we held that a search was unconstitutional where the officers executed an overbroad warrant, which failed to indicate which of three apartments located in the basement of an apartment building was to be searched, by searching all of the apartments until they found the one they were looking for. 428 F.2d at 234-35; see also Hinton, 219 F.2d at 326 (holding that the search of an entire building consisting of four apartments was unconstitutional where the officers were unable to determine which, if any, of the apartments belonged to the targets of the search).

   In this case, the Defendant Officers were executing a search warrant issued for the entire building located at 15138 Lincoln Avenue. According to the allegations pled in the complaint, this building consists of three apartments, each accessed through a separate external entrance marked by the word "Apt." and followed by a number. A separate doorbell is located next to the entrance to each apartment, and there are two gas meters located on the outside of the house providing separate service to the first and second floor apartments. The plaintiffs' apartment was on the second floor and could not be reached from the first floor apartment by any means other than by exiting the first apartment, going around to the side of the building, and entering through a separate door. The Defendant Officers in this case executed the warrant first on the ground floor apartment. They were told by the landlord

who was occupying that apartment that the building contained multiple units and that the second floor apartment was occupied by a man named Jacobs. After learning this information, the Defendant Officers exited the first floor apartment, went around the outside of the building, and entered the plaintiffs' apartment by breaking down a locked door marked with the words "Apt. 2."

Taking these allegations as true, it appears that reasonable officers should have discovered before entering plaintiffs' apartment that the building at 15138 Lincoln Avenue was a multi-unit building consisting of separate apartments and that the warrant they were executing was overbroad. At the moment the Defendant Officers discovered the defect in the description of the place to be searched, they were obligated to cease that search if they could not determine which apartment was properly the subject of the warrant. The Defendant Officers concede in their brief before this Court that they did not know which apartment was occupied by Troy at the time they conducted the search. Furthermore, there is nothing in the allegations of the com plaint that would have led a reasonable officer to conclude that plaintiffs' apartment was the appropriate target of the search. Because the search of plaintiffs' apartment occurred after it appears from the allegations in the complaint that a reasonable officer would have discovered a fatal defect in the warrant, we cannot conclude that the search was a valid execution of that warrant. See United States v. Ramirez, 112 F.3d 849, 852 (7th Cir. 1997) ("[O]nce [a] mistake is discovered, the government cannot use the authority of the warrant . . . to conduct a search . . . that they know is unsupported by probable cause.").

c. Warrantless Search

The Defendant Officers finally argue that even if the search was not validly conducted pursuant to a warrant, it was properly executed as a warrantless search. The Defendant Officers assert that they were faced with exigent circumstances because during drug raids such as this one there is a strong probability that evidence will be

destroyed. They further argue that they had probable cause to believe that Troy, the target of the search, was occupying one of the apartments in the building, and that because they had no reason to believe that it was not plaintiffs' apartment, they were justified in searching that apartment.

Where law enforcement officers have probable cause to believe that illegal activity is being conducted in a particular place and exigent circumstances exist, a warrantless search may be valid. See United States v. Marshall, 157 F.3d 477, 481-82 (7th Cir. 1998). Exigent circumstances may include the probability that evidence will be destroyed before a valid search warrant can be obtained from a neutral magistrate. Id. at 482. However, the bare fact that officers are executing a warrant to search for illegal narcotics is not sufficient to constitute exigent circumstances. Specific facts indicating that evidence is likely to be destroyed must be present in order for exigent circumstances to exist. See Richards v. Wisconsin, 520 U.S. 385, 394 (1997).

The allegations as pled in the plaintiffs' complaint give no indication that exigent circumstances existed in this case. There are as yet no facts on the record that would support a reasonable officer's conclusion that evidence of a crime was in imminent danger of being destroyed inside the plaintiffs' apartment at the time the Defendant Officers' conducted the search.

More importantly, probable cause, as used in this context, means that the officers must have cause to believe that illegal activity is taking place in a particular location. See Butler, 71 F.3d at 248; Hinton, 219 F.2d at 325-26. The fact that officers have probable cause to believe that illegal activity may be taking place in a general area does not authorize a search of every separate dwelling within that area until the illegal activity is discovered. See Johnson, 26 F.3d at 692; Higgins, 428 F.2d at 234-35. Furthermore, the burden is on the Defendant Officers to show that they had probable cause to search plaintiffs' apartment. It is not on plaintiffs to show that their apartment

should not have been searched. See Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971). In this case, the allegations in the complaint reveal that the police had probable cause to believe that a man named Troy was conducting illegal activity somewhere in the building located at 15138 Lincoln Avenue. However, there is no information presented in the complaint that would support a finding of probable cause that Troy occupied Apartment #2 or that illegal activity was occurring in that particular apartment as opposed to one of the two other apartments also located at that address. In fact, the Defendant Officers concede that at the time of the search, they were unable to determine which apartment was the source of the illegal activity they were sent to investigate. Therefore, we cannot conclude that a warrantless search of plaintiffs' apartment was justified. See Ybarra v. Illinois, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.")./5

Taking the allegations presented in the complaint as true, we cannot conclude that the search conducted in this case was made pursuant to a valid execution of a warrant or was a proper warrantless search. Therefore, on the current record, it appears that the search of plaintiffs' apartment violated their Fourth Amendment rights.

## 2. Clearly Established Law

We now consider whether the Defendant Officers' conduct violated clearly established law.

At the time the search in this case was conducted, it was clearly established that a warrant is fatally overbroad when it authorizes the search of an entire multi-unit building where the officers do not have probable cause to believe either that there is illegal activity occurring in each separate unit of the building or that the entire building is under the "dominion and control" of the person targeted for the search. See Garrison, 480 U.S. at 86-87; Butler, 71 F.3d at 249; Johnson, 26 F.3d at 694; United States v. Page, 580 F.2d 916, 920 (7th Cir. 1978); United States v. Gusan, 549 F.2d 15, 18-19 (7th Cir. 1977); Higgins,

428 F.2d at 234-35; Hinton, 219 F.2d at 326. It was also clearly established that where an officer mistakenly believes that a building is a single unit but later discovers that the building in fact contains multiple units, the officer is obligated to cease the search if he is unable to determine that the unit he is searching is properly the subject of the search. See Garrison, 480 U.S. at 86-87; Johnson, 26 F.3d at 692; Higgins, 428 F.2d at 234-35; Hinton, 219 F.2d at 326. Finally, it was clearly established that an officer cannot conduct a warrantless search of a residence unless he has probable cause to believe that there is illegal activity occurring in that particular residence and exigent circumstances are present. See Welsh v. Wisconsin, 466 U.S. 740, 748-50 (1984); Higgins, 428 F.2d at 234-35; Hinton, 219 F.2d at 326.

As discussed above, based on the allegations in the complaint, it appears that the Defendant Officers should have known before entering the plaintiffs' apartment that 15138 Lincoln Avenue was not a single-family residence and that plaintiffs' apartment was a dwelling unit separate from the other apartments in the building. In addition, no facts are alleged that would permit the inference that the Defendant Officers suspected plaintiffs' apartment was controlled by Troy, the target of the search. It appears from the complaint that the Defendant Officers should have been aware that the warrant was overbroad, and there is no indication that the officers were certain that plaintiffs' apartment was the proper subject of the search. In fact, according to the complaint, the Defendant Officers chose to execute the search warrant first on the ground floor apartment and proceeded to search plaintiffs' apartment only after they did not find what they were looking for in the first place they chose to search. Furthermore, there does not appear to be any independent probable cause for the Defendant Officers to believe that the plaintiffs' apartment in particular was the location of illegal activity.

From the facts pled in the complaint, we cannot conclude that the Defendant Officers in this case did not conduct a fishing expedition strikingly similar to the one we declared unconstitutional in

Higgins. 428 F.2d at 234-35 (concluding that the search was unconstitutional where "[i]t [was] evident that the officers could not determine from the warrant which apartment was to be searched and that they made that determination by searching all apartments until they discovered the one they were looking for"); see also Johnson, 26 F.3d at 692 (stating that a search is unconstitutional where "the officer was in effect playing a 'shell game' searching for the one apartment out of four where the illegal activity was occurring"). At the time the Defendant Officers conducted the search in this case, they were on notice from Supreme Court precedent, as well as from this Court's caselaw, that the type of random search of the apartments in a multi-unit building alleged here violates the Fourth Amendment. Therefore, we hold that, under the facts as alleged in the complaint, the Defendant Officers do not have qualified immunity from the plaintiffs' claims.

D. Seizure

Plaintiff Jacobs next argues that the Defendant Officers violated his clearly established Fourth Amendment rights when they detained him for over three hours during the search of his apartment.

A person who is not free to leave his home while officers are conducting a search is "seized" for Fourth Amendment purposes. Michigan v. Summers, 452 U.S. 692, 696 (1981). An official seizure is ordinarily unreasonable unless it is supported by probable cause, even where no formal arrest is made. See id.; Dunaway v. New York, 442 U.S. 200, 212-13 (1979). However, "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Summers, 452 U.S. at 705; see also United States v. Pace, 898 F.2d 1218, 1239 (7th Cir. 1990). This is because there is a substantial law enforcement interest in preventing the flight of a suspect in the event that incriminating evidence is found, in protecting the safety of the officers, and in the orderly completion of the search which is facilitated by the presence of the suspects. Summers, 452

U.S. at 703. Furthermore, "the detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant." Id.

However, where a search is illegal and not supported by probable cause, the justification for using the search as the foundation for the seizure disappears because it was the connection of the individual with a location suspected of harboring criminal activity that provided the reasonable basis for the seizure. See Florida v. Royer, 460 U.S. 491, 499 (1983) (construing Summers as holding that "the [search] warrant made the occupant sufficiently suspect to justify his temporary seizure"). When there is no longer probable cause to believe criminal activity is taking place at the location where an individual is found, the mere presence of the individual in that place is no justification for seizing that individual. In that circumstance, the foundation for seizing the individual must come from an independent probable cause determination that the individual is involved in illegal activity. See id. ("In the name of investigating a person who is no more than suspected of criminal activity, the police may not . . . seek to verify their suspicions by means that approach the conditions of arrest."); Dunaway, 442 U.S. at 216 (holding that the police may not seize an individual without probable cause in order to "embark[ ] upon [an] expedition for evidence in the hope that something might turn up") (quotation omitted).

As discussed above, on the facts alleged in the complaint, the search of the plaintiffs' home appears to be illegal and without probable cause. In addition, taking the allegations pled as true, the Defendant Officers in this case did not appear to have probable cause to believe that Jacobs was engaged in any illegal activity. The Defendant Officers were looking for a thirty-year-old man named Troy. Even if the officers had been justified in briefly detaining the-sixty-year-old Jacobs to ascertain if he were Troy, the manner in which the seizure is alleged to have been conducted, by breaking down the door to Jacobs' home and holding a gun to his head, and the three-hour duration of the seizure, do not appear on the facts presently alleged

to be reasonable efforts to obtain this information. See Royer, 460 U.S. at 500 ("The scope of the detention must be carefully tailored to its underlying justification."). Therefore, considering only the allegations in the complaint, we cannot conclude that the seizure and detention of Jacobs during the three hour search was reasonable and not in violation of his Fourth Amendment rights./6

At the time the search of Jacobs' apartment was conducted, it was clearly established that a citizen may not be detained by law enforcement officials without probable cause. It was further clearly established that an illegal search does not confer probable cause to detain the subject of the search while it is being carried out. See Summers, 452 U.S. at 696. Therefore, we hold that, under the allegations presented in the complaint, the Defendant Officers do not enjoy qualified immunity to Jacobs' claims that their unlawful seizure of his person violated his Fourth Amendment rights.

E. Use of Force

Plaintiff Jacobs also asserts that the Defendant Officers violated his Fourth Amendment rights when one of the officers placed a gun to Jacobs' head for over ten minutes during the initial period of the search of his apartment.

While "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," Graham v. Connor, 490 U.S. 386, 396 (1989), the Fourth Amendment prohibits the use of excessive force during the execution of a seizure, id. at 395 (holding that the Fourth Amendment's objective reasonableness test is the appropriate standard for evaluating excessive force claims). In order to decide whether the amount of force used during a seizure is "excessive," we examine the totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government interests at stake. See Lanigan v. Village of E. Hazel Crest, 110 F.3d 467, 475 (7th Cir. 1997). The Fourth Amendment test is an objective one, where

the officer's subjective good or bad intentions do not enter into the analysis. See Graham, 490 U.S. at 397. Instead, we consider factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. We also consider whether the citizen was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties. See McDonald v. Haskins, 966 F.2d 292, 292-93 (7th Cir. 1992). In the end, the excessive force inquiry "looks to whether the force used to seize the suspect was excessive in relation to the danger he posed--to the community or to the arresting officers--if left unattended." Id. at 294 (citing Wilkins v. May, 872 F.2d 190, 193 (7th Cir. 1989)).

According to the allegations pled in the complaint, plaintiff Jacobs was sitting at home alone in his apartment behind a locked door when one of the Defendant Officers broke down his door, entered his apartment without warning and pointed a gun at Jacobs' head. The officer kept the gun pointed at Jacobs for over ten minutes, even after ascertaining that Jacobs was not the person he was looking for, and during which time Jacobs did nothing more threatening than provide the officer with his identification and ask the officer for permission to sit down. As discussed above, at the time the Defendant Officers entered Jacobs' apartment, they do not appear to have had probable cause to suspect Jacobs had committed any crime or to believe that any criminal activity was being conducted in Jacobs' apartment. Taking these facts as true, it appears that the Defendant Officers' use of force against Jacobs while executing an allegedly illegal search of his home and an allegedly unlawful seizure of his person was out of proportion to any danger that Jacobs could possibly have posed to the officers or any other member of the community. We, therefore, cannot conclude that, considering only the allegations pled in the complaint, the Defendant Officers' use of force did not violate Jacobs' Fourth Amendment rights.

At the time the Defendant Officers used force against Jacobs in this case, it was clearly established that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." Clash v. Beatty, 77 F.3d 1045, 1048 (7th Cir. 1996). Furthermore, it was clear that "[a]n officer's use of deadly force to apprehend a suspect is unreasonable, absent probable cause that the suspect is dangerous or has committed a violent crime." McDonald, 966 F.2d at 294-95; see Estate of Starks v. Enyart, 5 F.3d 230, 234 (7th Cir. 1993) (finding that the amount of force that is constitutionally permitted to execute a seizure decreases with the threat of danger posed by the individual being seized). It was also established that holding the gun to a person's head and threatening to pull the trigger is a use of deadly force. See McDonald, 966 F.2d at 295./7 Under existing Seventh Circuit and Supreme Court precedent at the time the use of force occurred in this case, it appears to be clearly unreasonable for the Defendant Officers to have pointed a loaded weapon at Jacobs for an extended period of time when they allegedly had no reason to suspect that he was a dangerous criminal, or indeed that he had committed any crime at all, Jacobs was unarmed, and when Jacobs had done nothing either to attempt to evade the officers or to interfere with the execution of their duties. We therefore conclude that, taking the allegations in the complaint as true, the Defendant Officers are not shielded by qualified immunity from Jacobs' claim of excessive use of force.

III.  CONCLUSION

For the reasons stated herein, we Reverse the district court's dismissal of plaintiffs' claims and Remand this case for further proceedings consistent with this opinion.

/1 Because this case was dismissed under Rule 12(b)(6), we take all of the plaintiffs' allegations as true for purposes of this opinion.

/2 The district court dismissed the City of Chicago as a defendant in this matter because the plaintiffs failed to allege any policy or practice of constitutional violations that would render the city liable for the Defendant Officers' actions in this case. See Monell v.

Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978). In addition, on stipulation of the parties, the district court dismissed defendant officers Huff, Martin, Sowinski, and McIntyre. The plaintiffs do not contest the dismissal of any of these parties on appeal. Therefore, we address only the district court's dismissal of the complaint against the remaining Defendant Officers on qualified immunity grounds.

/3 We note that the dismissal of a sec. 1983 suit under Rule 12(b)(6) is a delicate matter that district courts should approach carefully. On one hand, courts have been admonished that qualified immunity is the ability to be free from suit, not merely a defense from liability, and that, therefore, the question of immunity should be decided at the earliest possible stage. See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 166 (1993); Mitchell v. Forsythe, 472 U.S. 511, 526 (1985); Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982). Our Court has held that resolution of this issue may be appropriate as early as dismissal under Rule 12(b)(6). See Landstrom v. Illinois Dep't of Children and Family Servs., 892 F.2d 670, 674 (7th Cir. 1990). On the other hand, the notice pleading requirements of Rule 8 do not require that a plaintiff anticipate the assertion of qualified immunity by the defendant and plead allegations that will defeat that immunity. See Crawford-El v. Britton, 523 U.S. 574, 595 (1998); Gomez v. Toledo, 446 U.S. 635, 639-40 (1980).

The Supreme Court has recognized the tension in this area but has declined to address this issue. See Leatherman, 507 U.S. at 166. But see Behrens v. Pelletier, 516 U.S. 299, 306-309 (1996) (holding that "an order rejecting the defense of qualified immunity at either the dismissal stage or the summary judgment stage is a 'final' judgment subject to immediate appeal") (emphasis added); Mitchell, 472 U.S. at 527 (holding that the "denial of a defendant's motion for dismissal or summary judgment on the ground of qualified immunity" is an appealable decision) (emphasis added). Similarly, we need not address this issue at this time. We merely note that it appears that in some cases, a complaint may be dismissed under Rule 12(b)(6) on qualified immunity grounds where the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred. In that case, while the plaintiff may have stated a claim, it is not one "upon which relief can be granted" and a court may properly address this purely legal question under Rule 12(b)(6). See Neitzke v. Williams, 490 U.S. 319, 326-27 (1989). However, in many cases, the existence of qualified immunity will depend

on the particular facts of a given case. In those cases, the plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity. (Of course, if the plaintiff does go beyond the requirements of Rule 8 and plead extensive facts in anticipation of an assertion of immunity, he may run the risk of pleading himself out of court.) The district court then has a variety of means at its disposal to move the case incrementally forward in order to address the qualified immunity issue at the earliest possible stage, so that a defendant who is immune from suit is not put through the time, effort and expense of defending himself against a claim upon which, ultimately, no relief can be granted. See Crawford-El, 523 U.S. at 597-98 (noting that the district court may order a reply to a defendant's answer under Rule 7(a) or a more definite statement of the plaintiff's claim under Rule 12(e)); Elliott v. Thomas, 937 F.2d 338, 345 (7th Cir. 1991) (stating that summary judgment may be granted in the district court's discretion without permitting discovery).

/4 From the allegations in the complaint, it appears that simple investigation procedures, such as contacting the gas, electric, or telephone company, would have revealed that the residence at 15138 Lincoln Avenue is a multi-unit apartment building. We note that officers seeking a search warrant relying on information provided by a confidential informant are under an obligation to take reasonable steps to confirm that information before using it in an affidavit in support of the warrant. See Illinois v. Gates, 462 U.S. 213, 241-42 (1983). If further discovery reveals that the officers should have known that the building contained multiple units at the time they applied for the search warrant, the warrant would be invalid. See Garrison, 480 U.S. at 85.

/5 Plaintiffs also argue that the search was unconstitutional because the Defendant Officers entered their apartment by breaking down the door without knocking or announcing that they were police officers executing a search warrant. It is well-established that "the Fourth Amendment incorporates the common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." Richards, 520 U.S. at 387; Wilson v. Arkansas, 514 U.S. 927 (1995). However, the knock and announce requirement may give way where there is a threat of physical violence or a reason to believe that evidence will be destroyed. Richards, 520 U.S. at 394 ("In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the

particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."). As noted above, neither of these circumstances appears to be present in this case from the facts pled in the complaint.

/6 The allegations in the complaint state that one of the Defendant Officers claims to have discovered contraband in one of the bedrooms of Jacobs' apartment. The discovery of this contraband does not provide probable cause for the seizure of Jacobs because, under the facts pled in the complaint, that seizure occurred immediately upon the Defendant Officers' entry into the apartment and before any contraband that may have been linked to Jacobs was found. See Royer, 460 U.S. at 507-08 (holding that a search conducted pursuant to consent given during an illegal seizure was unconstitutional); Dunaway, 442 U.S. at 216 (holding that an interrogation conducted during an illegal detention violated the suspect's Fourth Amendment rights and that information gained from the interrogation could not be used to justify the initial seizure).

/7 While it is not indicated in the complaint that the officer pointing the gun at Jacobs' head threatened to pull the trigger, it is a reasonable inference from the facts alleged that the act of pointing a loaded weapon at a person in the circumstances presented here carries with it the implicit threat that the officer will use that weapon if the person at whom it is directed does not comply with the officer's wishes.

 Easterbrook, Circuit Judge, concurring in part and concurring in the judgment.  I join the judgment and all of the opinion other than the portions suggesting that a complaint may be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief may be granted when, after receiving an answer and considering evidentiary submissions, the judge believes that the defendants are immune from damages liability. Immunity is an affirmative defense. Gomez v. Toledo, 446 U.S. 635, 640 (1980). What is more, qualified immunity defeats only a particular remedy, money damages. Sometimes money is the sole relief a plaintiff could seek, and if damages are unavailable the case should be dismissed. But a complaint does not limit the available relief, see Fed. R. Civ. P. 54(c), so, even when qualified immunity from damages is certain, the complaint may pass muster. And judgment following the answer should

come under either Rule 12(c) or Rule 56; dismissal under Rule 12(b)(6) is improper.

In Gomez the Supreme Court distinguished immunity from failure to state a claim on which relief may be granted. "By the plain terms of sec.1983, two--and only two--allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." 446 U.S. at 640. The complaint in Gomez contained both allegations, and the Court therefore reversed an order dismissing it under Rule 12(b)(6). Crawford-El v. Britton, 523 U.S. 574 (1998), has since insisted that courts not alter the elements or burdens under sec.1983 in the name of immunity. Cf. Leatherman v. Tarrant County, 507 U.S. 163 (1993) (no "heightened pleading standard" in sec.1983 cases). Any contrary decisions in this circuit cannot be reconciled with the instructions from the Supreme Court, and we should face up to this rather than say, as my colleagues do, that the use of Rule 12(b)(6) in immunity situations is a "delicate matter that district courts should approach carefully." Slip op. 5 n.3. Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal.

It is not possible to exclude use of Rule 12(b)(6), which covers "failure to state a claim upon which relief can be granted". One can imagine circumstances under which the complaint sets out a "claim" within the ambit of Gomez yet narrates facts showing that it is impossible to award relief. For example, a litigant who demands damages from a Member of Congress on account of a speech made on the floor has pleaded himself out of court; it is not necessary for the defendant to assert immunity under Art. I sec.6 cl. 1, because the complaint itself demonstrates that, however strong the claim in the abstract (perhaps the speech slandered a non-public figure), the court is forbidden to redress the injury. See Charles Alan Wright & Arthur R. Miller, 5 Federal Practice and Procedure sec.sec. 1226, 1276 (2d ed. 1990) (discussing built-in defenses). Sometimes a complaint designed to skirt 'round immunity may reveal the claim's substantive weakness and justify dismissal on the merits under Rule 12(b)(6). See Buckley v. Fitzsimmons, 20 F.3d 789 (7th Cir. 1994). As a rule, however, public officials' immunity defenses are qualified rather than absolute, the officials may elect to defend on the merits rather than to claim immunity, and when defendants do assert immunity it is essential to

consider facts in addition to those in the complaint. Considerations of immunity or other affirmative defenses rarely come to the fore until an answer has been filed. Defendants in this case filed an answer, to which they attached evidentiary materials. Rule 12(b) says that in such circumstances the judge must convert the proceedings to a request for summary judgment.

None of this is to deny what many cases have stressed: claims of immunity often justify dismissing a complaint in advance of discovery. But Crawford-El describes how this process should work. 523 U.S. at 598-99. First is an answer followed by a response under Rule 7 or a motion for a more definite statement under Rule 12(e). Second is the use of Rule 26(c) to curtail or foreclose discovery. As we observed in Elliott v. Thomas, 937 F.2d 338, 344-46 (7th Cir. 1991), which anticipated both Leatherman and Crawford-El, summary judgment is the right way to handle claims of immunity. See also Triad Associates, Inc. v. Robinson, 10 F.3d 492, 497 (7th Cir. 1993). District judges sometimes try to resolve immunity defenses under Rule 12 because they believe that they must allow discovery before ruling on motions for summary judgment, but this is incorrect. Defendants may seek summary judgment "at any time". Fed. R. Civ. P. 56(b). If immunity doctrines require decision without discovery (or with limited discovery), then district judges must use their authority under Rule 26(b)(2) and (c) to curtail or eliminate discovery and decide on the basis of affidavits and other evidence that can be produced without compulsory process. Immunity does not justify decision on the basis of allegations instead of evidence (which is what judgment under Rule 12 entails) or a pretense that a complaint that meets the standards of Gomez doesn't state a claim on which relief may be granted.

Nothing turns on the choice among Rule 12(b)(6), Rule 12(c), and Rule 56 in this case, because defendants are not entitled to immunity under any standard, but in other cases the choice between decision without evidence (Rule 12) and decision with evidence (Rule 56) could be decisive. Many district judges treat Rule 12(b)(6) as a grant of authority to terminate cases that lack promising futures. We resist this tendency in other corners of the law, e.g., Walker v. National Recovery, Inc., 200 F.3d 500 (7th Cir. 1999); Bennett v. Schmidt, 153 F.3d 516, 518 (7th Cir. 1998); Cook v. Winfrey, 141 F.3d 322 (7th Cir. 1998); American Nurses' Association v. Illinois, 783 F.2d 716, 727 (7th Cir. 1986), and should do so in this corner too. See also, e.g., Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S.

41, 45–46 (1957).